# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HUTAN TAGHAVI,           :
c/o JDKatz Attorneys at Law    :
4800 Montgomery Ln, Ste 600  :
Bethesda, MD 20814        :
Plaintiff,                  :
                         :
                         :     Civil Action No. _____
                         :
                         :
v.                       :
                         :
THE ISLAMIC REPUBLIC    :
OF IRAN,                :
THE ISLAMIC REVOLUTIONARY :
GUARD CORPS,        :
MINISTRY OF INTELLIGENCE  :
AND SECURITY OF THE ISLAMIC :
 REPUBLIC OF IRAN;      :
and DOES 1-50,         :
c/o Ministry of Foreign Affairs  :
Khomeni Avenue, United Nations St :
Tehran, Iran           :
Defendants.          :

## COMPLAINT

## INTRODUCTION

1. This action is brought by Plaintiff HUTAN TAGHAVI ("Plaintiff"), a naturalized United States citizen, against Defendants Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), the Ministry of Intelligence and Security of the Islamic Republic of Iran ("MOIS"), and DOES 1-50 (collectively, "Defendants") for damages arising from acts of torture, extrajudicial killing, hostage taking, and international terrorism.

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1330, 28 U.S.C. § 1331, 28 U.S.C. § 1332, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, the Torture

Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note, the Justice Against Sponsors of Terrorism Act ("JASTA"), and the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333.

3.  Plaintiff brings this action to seek redress for the brutal torture he personally endured, the extrajudicial killing of his father, the false imprisonment and death of his mother in the defendants' custody and the torture of his family members, and the ongoing campaign of terror, intimidation, and harassment that has followed him for over four decades across multiple countries, including within the United States.

4.  Defendants' acts were intended to intimidate and coerce Plaintiff and his family, to retaliate against them for his father's service in the previous Iranian government, and to silence any potential opposition to the Islamic Republic regime.

5.  The actions of Defendants constitute grave breaches of international law, violations of fundamental human rights, and acts of international terrorism as defined by United States and international law.

## PARTIES

6.  Plaintiff Hutan Taghavi is a naturalized United States citizen residing in Los Angeles, California. Plaintiff graduated from UCLA in 1977 with a PhD in Aerospace Engineering and has resided in the United States since his escape from Iran in approximately 1980. Plaintiff became a naturalized United States citizen on May 14, 1991.

7.  Plaintiff is the son of Abolfarz Taghavi, who served as Bureau Chief of SAVAK in Esfahan under the Shah's regime. Plaintiff's father was by the Islamic Republic of Iran in 1980 and has never been seen again. In 1980, Plaintiff was informed that his father was executed but the body was never turned over to the family and no burial location has ever been given. Plaintiff's mother was also arrested and kept in prison for a very long time until she died in prison.

8.   Plaintiff has standing to bring this action as a victim of torture and terrorism and as a close family member of a victim of extrajudicial killing. Plaintiff has suffered direct physical injury and severe emotional distress as a result of Defendants' actions.

9.   Defendant, the Government of the Islamic Republic of Iran ("Iran"), is a foreign sovereign designated a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App §2405(j)), Section 40 of the Arms Export Control Act (22 U.S.C. §2780), and Section 620A of the Foreign Assistance Act (22 U.S.C. § 2371). The Government of the Islamic Republic of Iran was designated a state sponsor of terrorism by the U.S. Secretary of State on January 19, 1984. See 49 Fed. Reg. 2836 (Jan. 23, 1984). The designation was in place both at the time of the events that gave rise to the issues in this Complaint and at the time this Complaint was filed.. Iran provides material support and resources to the IRGC, MOIS, and various terrorist organizations and proxies throughout the world.

10.  Defendant Islamic Revolutionary Guard Corps ("IRGC") is the military organization established by Ayatollah Khomeini after the 1979 Iranian Revolution. The IRGC is an agency or instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and is controlled by the Iranian government. On April 8, 2019, the United States designated the IRGC as a Foreign Terrorist Organization. The IRGC has engaged in terrorist activity and terrorism, including the acts described herein.

11.  Defendant Ministry of Intelligence and Security of the Islamic Republic of Iran ("MOIS") is the primary intelligence organization of the Islamic Republic of Iran. MOIS is an agency or instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and is controlled by the Iranian government. MOIS agents and operatives have engaged in acts of terrorism, including the acts described herein.

12. Pursuant to the test established by the United States Court of Appeals for the D.C. Circuit, the Revolutionary Guard and MOIS must be treated as the State of Iran itself as that term is used in 28 U.S.C. §1608 of the Foreign Sovereign Immunities Act. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003) (citing *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149–50 (D.C. Cir. 1994)).

13. Defendants DOES 1-20 are individuals who, at all relevant times, were officials, employees, agents, or operatives of Iran, the IRGC, or MOIS who participated in, ordered, authorized, or had knowledge of the acts described herein but whose identities are currently unknown to Plaintiff.

14. Defendants DOES 21-50 are individuals who, at all relevant times, acted as agents of Iran, the IRGC, or MOIS in carrying out the surveillance, harassment, intimidation, and attempted harm of Plaintiff in the United States and abroad, as described herein, but whose identities are currently unknown to Plaintiff.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1330, 1331, and 1605A. This suit falls within the "terrorism exception" to sovereign immunity under the FSIA, 28 U.S.C. § 1605A(a)(1), as it seeks money damages against a foreign state for personal injury and death caused by acts of torture, extrajudicial killing, and hostage taking engaged in by officials, employees, or agents of Iran while acting within the scope of their office, employment, or agency.

16. The acts alleged herein were perpetrated by officials, members, and agents of the IRGC and other agents and instrumentalities of Iran within their official capacities. Plaintiff was a U.S. citizen and national at the time of these acts, and Iran has been designated a "state sponsor of terrorism" by the Secretary of State since January 19, 1984.

17. This Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1330(b), and venue is proper pursuant to 28 U.S.C. § 1391(f)(4), as this is a civil action against a foreign state. This suit seeks money damages against Iran and its agencies and instrumentalities for injury and harm caused to the Plaintiff by acts of terrorism, torture, and other torts against Plaintiff.

18. These acts of terrorism and torture were perpetrated by officials, members, and agents of the IRGC and other agents and instrumentalities of Iran while acting within the scope of their official capacities.

      1. Plaintiff is a U.S. citizen and national of the United States within the meaning of the FSIA and was such at the time of the acts alleged herein.

19. Defendant Iran has been designated a "state sponsor of terrorism" by the Secretary of State since January 19, 1984.

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330, 28 U.S.C. § 1331, 28 U.S.C. § 1332, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq., particularly § 1605A, the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note, the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, and principles of supplemental jurisdiction.

21. Defendants are not immune from the jurisdiction of this Court under the FSIA, 28 U.S.C. § 1605A, because this action seeks money damages against a foreign state for personal injury and death caused by acts of torture, extrajudicial killing, hostage taking, and the provision of material support or resources for such acts, which were engaged in by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

22.    Additionally, Defendants are not immune under the FSIA's terrorism exception because

Iran has been designated as a state sponsor of terrorism, and Plaintiff and his family were,

at the time of the acts described herein, nationals of the United States or victims of torture

regardless of nationality.

## STATEMENT OF FACTS

**Background and Family History**

23. Plaintiff Hutan Taghavi is the son of Abolfarz Taghavi, who was born on March 10, 1917, and served in the Iranian military from approximately 1942 onwards.

24. At the age of 25, Abolfarz Taghavi trained in military tactics and served the Shah's regime with distinction for many years.

25. At the age of 43, in approximately 1960, Abolfarz Taghavi joined the Central Information Security Agency of Iran, commonly known as "SAVAK."

26. Under the Shah's direct order, Abolfarz Taghavi was promoted to Bureau Chief of SAVAK in Esfahan, an important provincial city in Iran, where he continued to serve until the Iranian Revolution in 1979.

27. Throughout his career, Abolfarz Taghavi was known for his loyalty to the Shah and his commitment to maintaining order and security within Iran.

28. Plaintiff Hutan Taghavi grew up in a close-knit family that included his father, his mother, his brother Homayoon, and his two sisters, Mahrokh and Marjan.

29. The Taghavi family's life before the Iranian Revolution was stable and secure, with Abolfarz Taghavi serving as the head of the household and maintaining a supportive family structure.

30. Plaintiff Hutan Taghavi pursued his education diligently, eventually traveling to the United States to study at the University of California, Los Angeles (UCLA).

31. In 1977, Plaintiff graduated from UCLA with a PhD in Aerospace Engineering, a prestigious academic achievement that positioned him for a successful career.

**The Iranian Revolution and Its Aftermath**

32. In 1979, the Iranian Revolution led to the overthrow of the Shah of Iran and the establishment of the Islamic Republic under the leadership of Ayatollah Ruhollah Khomeini.

33. During this period of political upheaval, individuals associated with the former regime, particularly those who had served in SAVAK, were targeted for arrest, detention, torture, and execution by the new revolutionary government.

34. In 1979, during the Iranian Revolution, Plaintiff's father, Abolfarz Taghavi, was arrested overnight and placed in Esfahan Central Prison without formal charges, due process, or legal representation.

35. Following Abolfarz Taghavi's arrest, the revolutionary authorities confiscated the family's house and all their belongings, including valuable personal items such as Plaintiff's mother's jewelry, which was seized under the pretense of being "evidence."

**Arrest and Torture of Plaintiff and His Family**

36. Following the arrest of Abolfarz Taghavi, Plaintiff and his siblings feared for their own safety, knowing that family members of former SAVAK officials were being targeted by the revolutionary regime.

37. In an attempt to avoid arrest and persecution, Plaintiff and his siblings went into hiding at his sister's house in Tehran, away from public view.

38. In February 1980, while Plaintiff and his siblings were hiding in his sister's house in Tehran, they were betrayed by a hired staff member who revealed their whereabouts to the revolutionary authorities in exchange for a ransom.

39. Upon receiving this information, armed members of the Iranian Revolutionary Guards Corps ("IRGC" or "KOMITEH") forcibly entered the house without a warrant or legal authorization.

40. The IRGC officers violently broke into the residence, terrorizing Plaintiff and his family members, and proceeded to arrest everyone present without presenting any charges or legal documentation justifying their actions.

41. Following their arrest, Plaintiff and his family members were separated and sent to different prison facilities throughout the country, a tactic commonly employed by the revolutionary regime to isolate family members and increase their psychological distress.

42. Plaintiff's brother Homayoon and his sisters Mahrokh and Marjan were sent to the notorious Evin Prison in Tehran, a facility known for its brutal treatment of political prisoners and systematic human rights violations.

43. At Evin Prison, Plaintiff's siblings were placed in solitary confinement, denied access to legal counsel, and subjected to severe mistreatment.

44. Plaintiff's sisters were repeatedly beaten, tortured, and subjected to various forms of physical and psychological abuse by IRGC and prison officials.

45. Plaintiff's brother Homayoon was subjected to particularly brutal torture methods, including having his hands crushed and bones broken with a hammer, causing permanent physical damage and disability.

46. Plaintiff's mother was also arrested and placed in solitary confinement, where she remained for many years until her death in custody, with no official notification or explanation provided to the family regarding the circumstances of her passing.

47. The Defendants never provided Plaintiff or his family with the remains of either his father or his mother, denying them the basic human right to properly bury and mourn their loved ones.

48. During the arrest, Iranian authorities discovered Plaintiff's expired UCLA identification card in his wallet, which they used as a pretext to accuse him of being an "American spy."

49. Based on this accusation and his status as the eldest son of Abolfarz Taghavi, Plaintiff was transferred to the central jail in Esfahan, where his father had been imprisoned.

50. Upon arrival at the Esfahan facility, Plaintiff was immediately placed in solitary confinement in a small, unsanitary cell with inadequate food, water, and medical attention.

51. During his detention, Plaintiff was subjected to various methods of torture, administered by agents and officials of the IRGC and other security forces of the Islamic Republic of Iran, including:

   a. Waterboarding, in which Plaintiff was immobilized while water was poured over his face, inducing a drowning sensation and causing extreme physical and psychological distress;

   b. Electrical torture, in which electrical currents were applied to sensitive parts of Plaintiff's body, causing excruciating pain and temporary paralysis;

   c. Severe beatings with various objects, resulting in bruising, lacerations, and internal injuries;

   d. Extended periods of forced standing;

   e. Sleep deprivation;

   f. Threats of execution and further harm to family members; and

   g. Other extremely painful methods specifically designed to cause maximum suffering without leaving permanent physical evidence.

52. Throughout his detention and torture, Plaintiff was repeatedly interrogated about his father's activities, his own education in the United States, and his alleged "espionage" activities, despite having no information to provide on any such matters.

53. After approximately one week of continuous torture and interrogation, during which Plaintiff maintained his innocence and had no information to provide, he was unexpectedly released.

54. Upon his release, Plaintiff learned that his sisters had also been released, but they bore the physical and psychological scars of the torture and abuse they had endured, including having been physically violated, attacked, and tortured during their detention.

55. Plaintiff's younger brother Homayoon, however, continued to be detained and subjected to ongoing torture and mistreatment.

**Execution of Plaintiff's Father and Continued Persecution**

56. In July 1980, following his initial release, Plaintiff was transferred to Tehran and formally released from custody, though without any legal documentation acknowledging his detention or the reasons for his arrest and subsequent release.

57. In August 1980, while watching the evening news on television, Plaintiff was shocked and devastated to see his father's picture displayed alongside a news report stating that Abolfarz Taghavi had been executed by firing squad.

58. This public announcement of his father's execution was made without any prior notification to the family, without evidence of a fair trial or legal process, and without any opportunity for family members to visit or communicate with Abolfarz Taghavi before his execution.

59. The public announcement of the execution was deliberately designed to humiliate the Taghavi family and serve as a warning to others who had served the previous regime.

60. Following his release and the announcement of his father's execution, Plaintiff was subjected to an ongoing campaign of terror and harassment orchestrated by agents of the IRGC and other security forces of the Islamic Republic of Iran.

61. This campaign included frequent midnight raids on his residence, deliberately disrupting his sleep and causing severe anxiety and psychological distress.

62. Whenever Plaintiff appeared in public, he was subjected to harassment, verbal abuse, and threats, with individuals calling him derogatory names and making explicit references to his father's role in the previous government.

63. During this period, members of the IRGC maintained a visible presence in areas frequented by Plaintiff, creating an atmosphere of constant surveillance and intimidation.

64. IRGC members were known to attack individuals perceived as opponents of the revolutionary regime at random as acts of retribution and to instill fear in the general population.

65. Determined to learn the truth about his father's fate and to recover his remains for proper burial according to their religious and cultural customs, Plaintiff traveled to Esfahan Central Jail.

66. At the Esfahan Central Jail, Plaintiff sought to collect his father's remains and death certificate and to inquire about the whereabouts of his siblings who had not yet been released.

67. However, jail officials, acting under the authority and direction of the Islamic Republic of Iran and the IRGC, deliberately denied Plaintiff and his family access to any information regarding his father or siblings.

68. This denial of information regarding the fate and whereabouts of family members constitutes an enforced disappearance under international law, causing severe mental pain and suffering to Plaintiff and his family.

69. Desperate for information about his father, Plaintiff persistently sought answers regarding his status through various official channels, including the Revolutionary Guards and the Revolutionary Court.

70. Despite Plaintiff's persistent inquiries, his father's status was not verified by any officials, leaving the family in a state of uncertainty and prolonged grief.

71. In response to Plaintiff's persistence in seeking information about his father, IRGC officers seized him during one of his visits to an official building.

72. These IRGC officers, acting within the scope of their employment and under the authority of the Islamic Republic of Iran, violently threw Plaintiff from the second floor of the building to the street below.

73. This deliberate act of violence resulted in Plaintiff suffering a broken head and profuse bleeding, requiring emergency medical attention.

74. With the assistance of a friend, Plaintiff was able to receive basic medical treatment, but fearing further violence and possibly death at the hands of the IRGC, he fled to Mashad to seek refuge with his uncle.

**Escape Attempts and Further Persecution**

75. While in Mashad, Plaintiff's uncle, concerned for his nephew's safety and recognizing the grave danger he faced if he remained in Iran, arranged for Plaintiff to return to Tehran with the ultimate goal of finding a way for him to leave the country.

76. Despite the dangers involved, Plaintiff continued to travel between Tehran and Esfahan, desperately seeking information about his father's remains and the circumstances of his execution.

77. These journeys were undertaken at great personal risk, as former SAVAK family members were routinely targeted by the revolutionary regime for harassment, detention, torture, and execution.

78. While driving back from Esfahan to Tehran during one such information-seeking trip, Plaintiff was involved in a car accident with a motorcyclist.

79. Acting as a responsible citizen, and despite the personal risk, Plaintiff and his uncle went to the hospital the following day to check on the motorcyclist's condition and offer to pay for their medical expenses.

80. Upon exiting the hospital after this compassionate act, Plaintiff and his uncle were surrounded by Revolutionary Guards who had been monitoring Plaintiff's movements.

81. Without presenting any warrant or legal justification, the Revolutionary Guards arrested both Plaintiff and his uncle, further demonstrating the regime's pattern of arbitrary detention and persecution.

82. Following their arrest, they were taken to a "Komiteh" headquarters run by Ayatollah Hojatti, a religious figure who, in the revolutionary system established after 1979, wielded the combined powers of judge, jury, and executioner, without regard for due process or the rule of law.

83. At this facility, Plaintiff was once again separated from his family member, continuing the pattern of isolation used by the regime as a form of psychological torture.

84. Plaintiff's uncle was placed in solitary confinement in the central prison, while Plaintiff was sent back to Tehran for a court hearing, a proceeding that lacked the fundamental elements of due process and fairness.

85. Following this court hearing, Plaintiff was eventually released, though the continued pattern of arbitrary arrest, detention, and release was designed to maintain a constant state of fear and uncertainty.

86. Recognizing that his life was in imminent danger if he remained in Iran, and with the assistance of his uncle who had also been released, Plaintiff made preparations to flee the country.

87. Through his uncle's careful arrangements and at great personal risk, Plaintiff managed to escape Iran by traveling through the Persian Gulf to Saudi Arabia, and from there to the United States.

88. This escape required substantial planning, resources, and risk, as the Iranian regime tightly controlled all borders and regularly prevented perceived enemies of the revolution from leaving the country.

89. Upon arriving in the United States, Plaintiff settled and attempted to rebuild his life, using his education and skills to establish himself professionally.

90. Despite being physically distant from Iran, the psychological trauma of his experiences— the torture he endured, witnessing the persecution of his family members, and the uncertainty regarding his parents' remains—continued to affect every aspect of his life.

91. The continuous fear of being monitored and potentially harmed by agents of the Iranian regime, even on American soil, created a persistent state of anxiety and vigilance that severely impacted Plaintiff's mental health and personal relationships.

92. This profound impact on Plaintiff's personal life was evidenced by the breakdown of his first marriage, which ended in divorce in 2003 after his wife could no longer bear the emotional burden of his ongoing trauma and feared for her own safety due to the potential threat from Iranian agents.

**Ongoing Surveillance, Harassment, and Attacks in the United States and Abroad**

93. Throughout the decades following his escape from Iran, Plaintiff lived with the persistent sensation of being under constant surveillance, with unseen eyes watching his every move, a fear that has been validated by multiple incidents and encounters.

94. The ongoing campaign of harassment and intimidation directed at Plaintiff constitutes a coordinated effort by agents of the Iranian regime to punish him for his father's role in the pre-revolutionary government and to silence any potential criticism of the Islamic Republic.

95. In 1993, an especially disturbing incident occurred when several individuals approached Plaintiff in a restaurant, claiming to have a message from his father. This encounter was particularly traumatic for Plaintiff, as he had been led to believe his father had been executed years earlier, leaving him to wonder whether his father was still alive and being tortured in an Iranian prison.

96. This psychological tactic, creating uncertainty about the fate of a loved one, is a recognized form of torture under international law and standards.

97. In 2019, while Plaintiff was visiting Arlington Cemetery in Washington DC, a significant and threatening incident occurred when a car suddenly pulled in front of him, deliberately blocking his exit from the cemetery.

98. The passenger of this vehicle shouted at Plaintiff, making an explicit death threat by stating that Plaintiff would soon be buried in a place like Arlington Cemetery.

99. The timing and location of this threat—at a national cemetery in the capital of the United States—demonstrates the boldness of the Iranian regime's agents and their willingness to operate on American soil in violation of U.S. sovereignty and law

100. That same year, Plaintiff was informed by a neighbor that unknown individuals had been observed filming his home while he was away, providing concrete evidence of the surveillance he had long suspected.

101. This surveillance of his private residence constitutes an invasion of privacy and represents an attempt to intimidate Plaintiff by demonstrating that agents of the Iranian regime know where he lives and can monitor his movements.

102. In 2020, while dining at a restaurant, Plaintiff was subjected to harassment from strangers who approached his table and hurled derogatory names at his father, making explicit reference to his father's work for the pre-revolutionary Iranian government.

103. The specific nature of these insults, referring to details of his father's career that would not be known to the general public, strongly suggests that these individuals were either agents of the Iranian regime or had been provided with specific information by such agents.

104. Also in 2020, Plaintiff was the victim of a physical assault while shopping at a grocery store in Encino, California, when a man and two women attacked him without provocation.

105. During this assault, the attackers pushed, kicked, and punched Plaintiff while explicitly blaming him for his father's work in Esfahan, again demonstrating specific knowledge that would not be available to random individuals.

106. This violent attack in a public place within the United States represents a significant escalation in the campaign against Plaintiff and a blatant violation of U.S. criminal law.

107. In the summer of 2020, while on a boat ride in Istanbul, Turkey, Plaintiff was approached by three individuals who verbally tormented him, made specific references to his father, and physically assaulted him by pushing him down the stairs on the boat.

108.  When other passengers came to Plaintiff's aid, the attackers claimed the incident was an accident, a common tactic used to disguise targeted violence as a random occurrence.

109.  The fact that this attack occurred in Istanbul, a city known for the presence of Iranian intelligence operatives, further supports the connection between these incidents and the Iranian regime.

110.  In 2021, the campaign of violence against Plaintiff continued to escalate when, during a business trip to Yokohama, Japan, a vehicle deliberately attempted to run him over as he was crossing a road.

111.  The occupants of this vehicle shouted Islamic slogans as they sped away, creating a clear connection between this attempted vehicular homicide and the Iranian regime.

112.  This incident in Japan demonstrates the global reach of the Iranian regime's campaign against Plaintiff and its willingness to attempt lethal violence against him on foreign soil.

113.  One man squeezed Plaintiff's shoulders, causing pain, and mentioned Plaintiff's father's SAVAK operations in Esfahan. One of the men punched Plaintiff, causing him to fall to the floor. The plaintiff shouted for help, and the attackers fled when others came to his aid.

114.  In 2023, Plaintiff discovered a deep scratch on his car, experienced late-night phone calls, and a mysterious doorbell rings with no one present, adding to his anxiety.

115.  In 1993, several people approached Plaintiff in a restaurant, claiming to have a message from his father. This was disturbing to Plaintiff, as he did not know whether his father was alive or where he was located.

116.  As a result of the stress and anxiety caused by these ongoing threats and harassment, Plaintiff has undergone heart surgery three times and suffers from psychological trauma, including hearing noises, seeing shadows, having nightmares, and experiencing sleep disturbances.

117. Plaintiff has essentially become a political refugee in the United States, attempting to protect himself and his siblings from ongoing attacks by the Islamic regime.

118. Plaintiff continues to suffer from not knowing where his father and mother are buried or what happened to their remains, as well as from the knowledge of the harsh mental and physical torture experienced by his siblings.

# FIRST CAUSE OF ACTION

## (Torture – Violation of the Torture Victim Protection Act)

119. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. The Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note, creates a cause of action against individuals who, under actual or apparent authority, or color of law, of any foreign nation, subject an individual to torture.

121. The acts of torture inflicted upon Plaintiff as described above, including waterboarding, electrical torture, beatings, and other extremely painful methods, were deliberately and intentionally inflicted by officials, employees, and agents of the Islamic Republic of Iran, the IRGC, and MOIS.

122. These acts of torture were inflicted while the perpetrators were acting under the actual or apparent authority, or color of law, of the Islamic Republic of Iran.

123. The perpetrators of these acts were acting within the scope of their office, employment, or agency when inflicting torture upon Plaintiff.

124. The torture of Plaintiff was inflicted intentionally for purposes which included, among others:

>    a. Obtaining information or a confession from Plaintiff regarding his father's activities and his own alleged espionage;
>
>    b. Punishing Plaintiff for his father's association with the former regime;
>
>    c. Intimidating or coercing Plaintiff;
>
>    d. Discriminating against Plaintiff based on his political background and family associations; and
>
>    e. Creating a climate of fear to suppress potential political opposition.:

125. The ongoing campaign of surveillance, harassment, threats, and physical attacks described above constitute a continuing pattern of conduct that includes acts of torture and attempted torture that continue to the present day.

126. As a direct and proximate result of the torture inflicted upon Plaintiff by Defendants, Plaintiff has suffered and continues to suffer severe, lasting physical and emotional injuries, including but not limited to:

    a. Permanent physical injuries from the torture techniques employed against him;

    b. Heart conditions requiring multiple surgeries;

    c. Post-Traumatic Stress Disorder and other psychological trauma;

    d. Ongoing fear, anxiety, and hypervigilance;

    e. Sleep disorders and recurring nightmares;

    f. Damage to personal and professional relationships; and

    g. Significant diminishment in quality of life and capability for happiness.

127. The acts described above constitute torture within the meaning of the TVPA and are actionable thereunder.

## SECOND CAUSE OF ACTION

### (Extrajudicial Killing – Foreign Sovereign Immunities Act)

128. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

129. The Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, creates a federal cause of action against a foreign state that is or was a state sponsor of terrorism for personal injury or death caused by acts of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such acts.

130. Iran has been continuously designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 4605(j)) since January 19, 1984.

131. The execution by firing squad of Plaintiff's father, Abolfarz Taghavi, as announced on Iranian television in August 1980, was an extrajudicial killing as defined by the TVPA and actionable under the FSIA.

132. This killing was not authorized by a previous judgment of a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples.

133. Instead, this killing was carried out summarily, without due process of law, as part of the Islamic Republic of Iran's systematic campaign to eliminate individuals associated with the previous regime.

134. The killing of Plaintiff's father was deliberate and was carried out by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

135. As a close family member of a victim of an extrajudicial killing, Plaintiff has standing to bring this action under the FSIA.

136. As a direct and proximate result of the extrajudicial killing of Plaintiff's father by Defendants, Plaintiff has suffered severe mental anguish, bereavement, and loss of society, companionship, comfort, protection, and parental guidance.

137. Additionally, the refusal of Defendants to release Abolfarz Taghavi's remains to his family for proper burial has caused Plaintiff continuing mental anguish and emotional distress, as it has denied him the opportunity to properly mourn his father according to his religious and cultural traditions.

138. The extrajudicial killing of Abolfarz Taghavi by Defendants is actionable under 28 U.S.C. § 1605A

### THIRD CAUSE OF ACTION

### (Hostage Taking – Foreign Sovereign Immunities Act)

139. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

140. The FSIA, 28 U.S.C. § 1605A, creates a federal cause of action against a foreign state that is or was a state sponsor of terrorism for personal injury or death caused by acts of hostage taking or the provision of material support or resources for such acts.

141. "Hostage taking" as defined by the International Convention Against the Taking of Hostages means seizing or detaining and threatening to kill, injure, or continue to detain another person in order to compel a third party to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage.

142. The detention of Plaintiff, his siblings, and his parents by Defendants constituted hostage taking within the meaning of the FSIA because:

    a. They were seized and detained by officials, employees, or agents of Defendants;

    b. The detainees were threatened with continued detention, injury, and death;

    c. These threats were made to compel the detainees and their family members to provide information about alleged political activities and to deter any opposition to the revolutionary regime; and

    d. The release of the detainees was implicitly conditioned on their cooperation and submission to the revolutionary regime's authority.

143. The detention of Plaintiff's family members, particularly his mother who died in custody and his father who was executed, constituted hostage taking that was deliberate and was carried out by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

144. As a direct and proximate result of the hostage taking of Plaintiff and his family members by Defendants, Plaintiff has suffered severe physical injuries, emotional distress, and psychological trauma.

145. The hostage taking of Plaintiff and his family members by Defendants is actionable under 28 U.S.C. § 1605A.

**FOURTH CAUSE OF ACTION**

**(Terrorism – Foreign Sovereign Immunities Act)**

146. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

147. The FSIA, 28 U.S.C. § 1605A, creates a federal cause of action against a foreign state that is or was a state sponsor of terrorism for personal injury or death caused by the provision of material support or resources for acts of terrorism.

148. The ongoing campaign of harassment, intimidation, threats, and physical attacks against Plaintiff described above constitutes acts of international terrorism as defined by United States and international law.

149. These acts, which include but are not limited to:

a. The 2019 death threat at Arlington Cemetery in Washington DC;

b. The surveillance of Plaintiff's home in 2019;

c. The public harassment referring to Plaintiff's father in 2020;

d. The physical assault in a grocery store in Encino, California in 2020;

e. The attack on the boat in Istanbul in 2020;

f. The attempted vehicular homicide in Yokohama, Japan in 2021;

g. The assault at the NASA conference at UCLA in 2022; and

h. The property damage and continued psychological intimidation in 2023;

150. These acts were intended to intimidate and coerce Plaintiff, to retaliate against him for his father's association with the former regime, and to suppress any potential criticism of the Islamic Republic by demonstrating the regime's ability to reach its perceived enemies even within the United States.

151. The Islamic Republic of Iran, the IRGC, and MOIS provided material support and resources for these acts of terrorism, including but not limited to funding, training, intelligence, transportation, and logistical support to the individuals who carried out these acts.

152. These acts of terrorism were carried out by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

153. As a direct and proximate result of these acts of terrorism, Plaintiff has suffered and continues to suffer severe physical and psychological injuries, including heart conditions requiring multiple surgeries, post-traumatic stress disorder, and ongoing fear, anxiety, and trauma.

154. The acts of terrorism directed against Plaintiff by Defendants are actionable under 28 U.S.C. § 1605A.

### FIFTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress – Foreign Sovereign Immunities Act)**

155. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156. The FSIA, 28 U.S.C. § 1605A, permits claims for intentional infliction of emotional distress against foreign states designated as state sponsors of terrorism.

157. The conduct of Defendants as described above was extreme and outrageous and exceeded all bounds of decency.

158. Such conduct was specifically intended to cause Plaintiff severe emotional distress, and did in fact cause Plaintiff severe emotional distress.

159. This conduct includes, but is not limited to:

   a. The torture of Plaintiff and his family members;

   b. The execution of Plaintiff's father and death of his mother in their custody;

   c. The refusal to provide information about the fate and location of Plaintiff's parents' remains;

   d. The 1993 incident where individuals claimed to have a message from Plaintiff's presumably executed father;

160. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress manifesting in physical symptoms including cardiac problems requiring multiple surgeries, sleep disturbances, and other physical manifestations of psychological trauma.

161. The intentional infliction of emotional distress by Defendants is actionable under 28 U.S.C. § 1605A.

### SIXTH CAUSE OF ACTION

### (Assault and Battery – Foreign Sovereign Immunities Act)

162. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

163. The FSIA, 28 U.S.C. § 1605A, permits claims for assault and battery against foreign states designated as state sponsors of terrorism.

164. The physical attacks against Plaintiff described above, including but not limited to:

   a. The torture inflicted upon Plaintiff during his detention in Iran;

      b. Being thrown from the second floor of a building by Revolutionary Guards;

      c. The physical assault in a grocery store in Encino, California in 2020;

      d. Being pushed down stairs on a boat in Istanbul in 2020;

      e. The attempted vehicular homicide in Yokohama, Japan in 2021; and

      f. The assault at the NASA conference at UCLA in 2022;

      which constituted batteries upon Plaintiff.

165. Additionally, Defendants' conduct created a reasonable apprehension of immediate harmful contact with Plaintiff's person, constituting assault.

166. These assaults and batteries were carried out by officials, employees, or agents of Defendants while acting within the scope of their office, employment, or agency.

167. As a direct and proximate result of these assaults and batteries, Plaintiff has suffered physical injuries, pain, suffering, and emotional distress.

168. The assaults and batteries committed against Plaintiff by Defendants are actionable under 28 U.S.C. § 1605A.

## SEVENTH CAUSE OF ACTION

### (Civil Conspiracy – Foreign Sovereign Immunities Act)

169. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

170. Defendants and their officials, employees, and agents conspired, confederated, and agreed to commit the tortious acts described above against Plaintiff and his family members.

171. This conspiracy involved multiple individuals and entities acting in concert over a period of decades to carry out a coordinated campaign of persecution against Plaintiff and his family.

172.  In furtherance of this conspiracy, Defendants and their co-conspirators committed numerous overt acts, including but not limited to:

    a. The arrest, detention, and torture of Plaintiff and his family members;

    b. The execution of Plaintiff's father;

    c. The confiscation of the family's property;

    d. The ongoing surveillance of Plaintiff both in Iran and in the United States;

    e. The multiple physical attacks against Plaintiff in various countries; and

    f. The continuous campaign of psychological intimidation directed at Plaintiff.

173.  As a direct and proximate result of this conspiracy, Plaintiff has suffered the injuries and damages described throughout this Complaint.

174.  The civil conspiracy engaged in by Defendants is actionable under 28 U.S.C. § 1605A.

## PRAYER FOR RELIEF

175.  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

A. Awarding Plaintiff compensatory damages in an amount to be determined at trial, but not less than $100,000,000, for the physical, psychological, and emotional injuries he has suffered;

B. Awarding Plaintiff compensatory damages for the extrajudicial killing of his father in an amount to be determined at trial, but not less than $100,000,000;

C. Awarding Plaintiff economic damages for medical expenses, therapy costs, lost earning capacity, and other financial losses in an amount to be determined at trial, but not less than $10,000,000;

D. Awarding Plaintiff punitive damages in an amount to be determined at trial, but not less than $500,000,000, that is sufficient to punish Defendants for their outrageous conduct and to deter them and others from similar conduct in the future;

E. Awarding Plaintiff prejudgment and post-judgment interest;

F. Awarding Plaintiff his costs and reasonable attorneys' fees incurred in this action; and

G. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

176.  Plaintiff demands a trial by jury on all issues so triable.

## VERIFICATION

I, HUTAN TAGHAVI, declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct to the best of my knowledge, information, and belief.

Executed on March _____, 2025 at Los Angeles, California.

HUTAN TAGHAVI

Dated: March ___8___, 2025

Respectfully submitted,

Jeffrey D. Katz Attorney for Plaintiff

Jared B. Stape, Attorney for Plaintiff

Jeffrey D. Katz Bar# ___17071___
JDKatz, P.C.
4800 Montgomery Avenue, Suite 600
Bethesda, MD 20814
Phone: (240) 743-5408
Email: Jeffrey@JDKatz.com